

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-20-00525-CV

**IN THE INTEREST OF F.A.M., JR.,** a Child

From the 45th Judicial District Court, Bexar County, Texas
Trial Court No. 2019PA01301
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:     Beth Watkins, Justice

Sitting:        Luz Elena D. Chapa, Justice
                Beth Watkins, Justice
                Liza A. Rodriguez, Justice

Delivered and Filed: June 9, 2021

AFFIRMED

G.R. appeals the trial court's order terminating her parental rights to her child F.A.M. (born

2018).[1] On appeal, she argues the evidence is factually insufficient to support the trial court's

findings under Texas Family Code section 161.001(b)(1) as well as its finding that termination is

in F.A.M.'s best interest. She also challenges the trial court's conservatorship findings. We affirm

the trial court's order.

### BACKGROUND

On June 27, 2019, the Texas Department of Family and Protective Services removed

F.A.M. from G.R.'s care after receiving a report that F.A.M. was present during an incident of

---

[1] To protect the privacy of the minor children, we use initials to refer to the children and their biological parents. TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

domestic violence between G.R. and her mother, that the family was homeless, and that drug use occurred in F.A.M.'s presence. The Department obtained temporary managing conservatorship over F.A.M., placed him with a foster family, and filed a petition to terminate G.R.'s parental rights. The Department also created a family service plan requiring G.R. to, inter alia: adhere to random drug screens; demonstrate her ability to live a drug-free lifestyle; complete drug treatment; obtain safe and appropriate housing; and complete a psychological evaluation. G.R. signed the service plan and the trial court ordered her to comply with it. The Department ultimately pursued termination of G.R.'s parental rights.

Sixteen months after removal, the trial court held a two-day bench trial via Zoom at which G.R. appeared. The trial court heard testimony from four witnesses: (1) the Department's initial caseworker, Sandra Jordan; (2) the Department's final caseworker, Orlando Herrera; (3) F.A.M.'s foster father; and (4) G.R. At the conclusion of trial, the court signed an order terminating G.R.'s parental rights pursuant to Texas Family Code section 161.001(b)(1)(N), (O), and (P), and finding that termination of G.R.'s parental rights was in the best interest of F.A.M.

## ANALYSIS

On appeal, G.R. challenges the factual sufficiency of the evidence supporting the trial court's grounds findings as well as its best interest finding.

### *Standard of Review*

The involuntary termination of a natural parent's rights implicates fundamental constitutional rights and "divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent." *In re S.J.R.-Z.*, 537 S.W.3d 677, 683 (Tex. App.—San Antonio 2017, pet. denied) (internal quotation marks omitted). "As a result, appellate courts must strictly scrutinize involuntary termination proceedings in favor of the parent." *Id.* The Department had the burden to prove, by clear and

convincing evidence, both that a statutory ground existed to terminate G.R.'s parental rights and that termination was in the best interest of the child. TEX. FAM. CODE ANN. § 161.206; *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re S.J.R.-Z.*, 537 S.W.3d at 683.

When reviewing the sufficiency of the evidence supporting a termination order, we apply well-established standards of review. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). In a factual sufficiency review, we review and weigh all the evidence, including the evidence that is contrary to the trial court's findings. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). We consider whether the disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the challenged finding. *In re J.F.C.*, 96 S.W.3d at 266. The evidence is factually insufficient only if "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." *Id.*

The trial court, as factfinder, is the sole judge of the weight and credibility of the evidence. *In re A.F.*, No. 04-20-00216-CV, 2020 WL 6928390, at *2 (Tex. App.—San Antonio Nov. 25, 2020, no pet.) (mem. op.). We must defer to the factfinder's resolution of disputed evidentiary issues and cannot substitute our judgment for that of the factfinder. *See, e.g., In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

### Statutory Termination Grounds

*Applicable Law*

In her first argument on appeal, G.R. challenges the factual sufficiency of the evidence to support the grounds for the termination order. Under section 161.001(b)(1)(P) of the Family Code,

a trial court may terminate the parent-child relationship if it finds by clear and convincing evidence that the parent has "used a controlled substance. . . in a manner that endangered the health or safety of the child, and: . . . (ii) after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance." TEX. FAM. CODE ANN. § 161.001(b)(1)(P). When, as here, the trial court terminates a parent's rights on multiple predicate grounds, we may affirm on any one ground. *In re A.V.*, 113 S.W.3d at 362; *In re D.J.H.*, 381 S.W.3d 606, 611–12 (Tex. App.—San Antonio 2012, no pet.).

*Application*

On appeal, G.R. argues factually insufficient evidence supports the subsection (P) grounds. The trial court heard evidence that F.A.M. came into the Department's care after "law enforcement was contacted due to a domestic violence dispute between [G.R.] and her mother" while F.A.M. was present. At that time, G.R. tested positive for cocaine and methamphetamines, and admitted "that her and her mother had used cocaine laced with ICE." The trial court heard testimony that G.R. successfully completed a court-ordered substance abuse treatment program on March 20, 2020. The trial court also heard testimony that G.R. "had negative UA's up until August 14th, when [she] had a UA which was positive for synthetic marijuana." When asked about the August 14 drug test, G.R. testified that the drug testing center "had messed up." She testified emphatically that she had not used drugs "since December of last year." However, when G.R. took a drug test in September of 2020, that test came back positive for cocaine. G.R.'s caseworker also testified that when she saw G.R. eight days after the August 14 drug test, "her appearance had changed back to the way it was the first six months when she had been using."

After the August 14 drug test, the Department referred G.R. to a drug relapse program. Instead of re-enrolling in drug treatment, she "stated she was not doing anymore services, because she had already completed services." F.A.M.'s foster father also testified that three days before

trial, G.R. posted a brief video of her smoking a marijuana cigarette on Facebook, and she "posted numerous photos on Facebook about using drugs and photos of drugs" in the weeks before trial. G.R. admitted that in the video, she "was smoking, but it was not marijuana or synthetic. It was a cigar." She also explained, "I post stuff that I think is funny. It doesn't mean it relates to me."

Here, the trial court could have reasonably credited the Department's evidence and discredited G.R.'s evidence. *See In re A.F.*, 2020 WL 6928390, at *2. After reviewing and weighing all the evidence, including the evidence that is contrary to the trial court's findings, we conclude the evidence presented would have allowed the trial court to form a firm belief that G.R. had used a controlled substance in a manner that endangered the health or safety of F.A.M. and continued to abuse a controlled substance after completing a court-ordered substance abuse treatment program. *See In re R.S.-T.*, 522 S.W.3d 92, 98 (Tex. App.—San Antonio 2017, no. pet.). We conclude factually sufficient evidence supports the trial court's finding that G.R. violated section 161.001(b)(1)(P), and therefore overrule G.R.'s first argument on appeal.

### Best Interest

### Applicable Law

Next, G.R. challenges the factual sufficiency of the evidence supporting the trial court's finding that termination of her parental rights was in F.A.M.'s best interest. There is a strong presumption that a child's best interest is served by maintaining the relationship between a child and the natural parent, and the Department has the burden to rebut that presumption by clear and convincing evidence. *See, e.g., id.* at 97. To determine whether the Department satisfied this burden, the Texas Legislature has provided several factors[2] for courts to consider regarding a

---

[2] These factors include, inter alia: "(1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological,

parent's willingness and ability to provide a child with a safe environment, and the Texas Supreme Court has provided a similar list of factors[3] to determine a child's best interest. TEX. FAM. CODE ANN. § 263.307(b); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

A best interest finding, however, does not require proof of any particular factors. *See In re Z.F.S.*, No. 04-20-00489-CV, 2021 WL 603372, at *6 (Tex. App.—San Antonio Feb. 17, 2021, no pet.) (mem. op.). Neither the statutory factors nor the *Holley* factors are exhaustive, and "[e]vidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *See id*. Finally, "[a] trier of fact may measure a parent's future conduct by his past conduct [in] determin[ing] whether termination of parental rights is in the child's best interest." *See id*.

*Application*

The trial court received evidence that in 2018, before this legal case began, the Department investigated G.R. and F.A.M.'s father for domestic violence and found a reason to believe neglectful supervision had occurred. G.R. began receiving family-based services from the Department at that point. Then, in June of 2019, after receiving the report that F.A.M. was present

---

or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills [. . .]; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child." TEX. FAM. CODE § 263.307(b).

[3] Those factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the best interest of the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371–72.

during an incident of domestic violence between G.R. and her mother, the Department removed F.A.M. from G.R.'s care and initiated this case.

During this legal proceeding, G.R. completed parenting and domestic violence classes, as well as the psychological evaluation and much of the counseling the Department required. After monitoring her progress, the court found that G.R. had demonstrated adequate compliance with the service plan and returned F.A.M. to her care for "a monitored reunification." The Department obtained housing for G.R. and F.A.M. at Seton Home, a facility dedicated to helping young parents become independent. While at Seton Home, F.A.M. had daycare and G.R. enrolled in GED classes. She qualified to stay at Seton Home "'til '21. . . if she was going to school, she could have stayed longer than that." The Department believed G.R.'s conditions at Seton Home qualified as stable housing. According to G.R., Seton Home was supposed to help her get her birth certificate, social security, housing, and a job, but because of the Coronavirus pandemic, those services did not occur. Concerned about how she was going to pay her bills, G.R. told Jordan she wanted to leave Seton Home after approximately three months to move in with her boyfriend. Jordan counseled her about the risks of "walking out on a very good program," but G.R. reported she had a job waiting for her and needed to leave to take it.

After an investigation, the Department approved G.R.'s move from Seton Home into her boyfriend's home. The Department arranged for daycare for F.A.M., but G.R. did not take him to daycare. Jordan testified that "it turned out [G.R.] did not" have the job she left Seton Home to take. After approximately two weeks, G.R. and F.A.M. left her boyfriend's home at 1:30 in the morning after an argument. She went to her mother's home, but wanted to go back to Seton Home, so the Department arranged for G.R. and F.A.M.'s return. Then, twenty-six hours after returning to Seton Home, G.R. "broke her safety plan and left" Seton Home to return to her boyfriend's home. *See* TEX. FAM. CODE § 263.307(b)(10), (11) (court may consider parent's willingness and

ability to "cooperate with and facilitate an appropriate agency's close supervision" and to effect positive changes within a reasonable time). Jordan testified unequivocally, "This is just not stable for a child of two." G.R. has since asked to return to Seton Home, but Seton Home reported that G.R. would not be allowed back in the program. *See Jordan v. Dossey*, 325 S.W.3d 700, 731 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (finding instability of child's home supported termination finding).

G.R. is now living with her mother—from whom G.R. herself was removed as a child. G.R.'s mother "has extensive criminal history, extensive CPS history." *See In re J.M.*, No. 09-09-00042-CV, 2009 WL 5214921, at *4 (Tex. App.—Beaumont Dec. 31, 2009, no pet.) (mem. op.) (noting Department's concerns that mother allowed family members with criminal histories to stay overnight in child's home). G.R. admitted to having used drugs with her mother while receiving family-based services from the Department. TEX. FAM. CODE § 263.307(b)(8) (court may consider "history of substance abuse by the child's family or others who have access to the child's home"). Despite having completed a domestic violence class and removing herself from arguments with her boyfriend before they could turn violent, G.R. and her mother have gotten into physical fights. *Id.* at § 263.307(b)(7) (court may consider "whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home"); *id.* at § 263.307(b)(12)(E) (court may consider whether parent "demonstrates adequate parenting skills" by, inter alia, protecting child "from repeated exposure to violence even though the violence may not be directed at the child"). G.R. testified that she has lived with her mother for about one year and was aware of her mother's criminal history, but was not aware her mother had obtained two new criminal charges—including a drug charge—one month before trial. She also testified that she would agree to a condition of no contact between F.A.M. and his maternal grandmother if the

Department made that a condition of his return. G.R.'s plan was to stay in her mother's home and for her mother to move out.

G.R. testified she was working full-time at "a convenient store on Ruiz," but could not remember the store's name and could not provide the name of her supervisor. She explained that her supervisor was not willing to write a letter verifying that she works there but had agreed to sign a letter provided by the Department to verify her employment. As of the date of trial, however, G.R. had not provided proof of employment. *See In re A.J.Z.*, No. 04-20-00218-CV, 2020 WL 5913845, at *5 (Tex. App.—San Antonio Oct. 7, 2020, no pet.) (mem. op.) (considering parent's failure to provide proof of employment). She did, however, testify that she was making $7.25 per hour, and believed she was earning enough to provide for F.A.M. and pay monthly rent of $950, including some utilities.

After F.A.M. was removed from G.R.'s care the first time, he was placed in two foster homes before being placed with his third and final foster family. During the pendency of this case, he was removed from the third foster family and returned to his mother's care. When F.A.M. was removed from G.R.'s care the second time and returned to the third foster family, his foster father testified F.A.M. had grown educationally, intellectually, and physically while he was with his mother. When returned to the foster father's care, F.A.M. "would spout out a few words that I would not repeat in front of the Court, but we were able to strip him from that vocabulary to something more appropriate." Since then, the foster father explained, F.A.M. has developed a good bond and attachment with his foster parents—he has started calling them mommy and daddy on occasion. The caseworker testified F.A.M. "is very bonded with [his foster parents], very comfortable in their home, there is structure, there is routine, and he's really happy there." The foster parents love F.A.M., and "he just absolutely loves being here." *See In re D.A.B.*, No. 04-19-00629-CV, 2020 WL 1036433, at *7 (Tex. App.—San Antonio Mar. 4, 2020, no pet.) (mem. op.)

(noting when, as here, a child is too young to express his desires, the trial court may consider whether the child has bonded with current caregivers). The foster parents plan to adopt F.A.M. if his parents' rights are terminated. *See In re L.J.T.*, No. 04-17-00567-CV, 2018 WL 1072346, at *7 (Tex. App.—San Antonio Feb. 28, 2018, no pet.) (mem. op.) (evidence child is doing well in foster care is relevant to best interest determination).

At trial, G.R. testified that F.A.M. should be placed with his biological family and asked that he be placed with her sister, who was willing to take him. G.R. admitted, however, that her sister had a criminal record. As a result, the Department did not believe G.R.'s sister was an appropriate placement. And, as previously described, the caseworkers explained their belief that G.R.'s mother was not an appropriate placement.

The caseworkers both testified that termination of G.R.'s parental rights was in F.A.M.'s best interest. Jordan testified that G.R. has not demonstrated the ability to manage the care of her child independently—she has always relied on an organization like Seton Home to provide her with the stability that she needed to be an appropriate parent. TEX. FAM. CODE § 263.307(b)(12); *Jordan*, 325 S.W.3d at 731. Jordan explained G.R.'s decision to "turn her back on" the support provided by Seton Home, and to engage in a relationship with her mother indicated that G.R. lacked the judgment necessary to protect F.A.M. Jordan also testified that G.R. was unable to provide F.A.M. with a safe and stable home independent of Seton Home, and that "bouncing around from place to place" had a negative impact on F.A.M. *See In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *8–9 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.) (evidence that mother's conduct subjected children "to a life of uncertainty and instability" supported finding that termination was in children's best interest).

Finally, evidence that proves a statutory ground for termination is probative on the issue of best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). Moreover, a factfinder in a termination

case may infer "that a parent's future conduct may well be measured by recent deliberate past conduct as it relates to the same or a similar situation." *In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.). Here, as noted above, the trial court heard evidence that G.R. used drugs after completing a court-ordered substance abuse treatment program. *See In re C.H.*, 89 S.W.3d at 28; *see also* TEX. FAM. CODE § 161.001(b)(1)(P).

Earlier in the case, it appears the *Holley* factors were divided and, as a result, the Department attempted a monitored reunification. *See Holley*, 544 S.W.2d at 371–72. G.R.'s lack of stable housing, however, became more of a problem as F.A.M. became a toddler. *See id*. The evidence about G.R.'s recent drug use as well as her mother's recent drug charge support the trial court's best interest finding. *See, e.g., In re K.J.G.*, 2019 WL 3937278, at *8; *see also* TEX. FAM. CODE § 263.307(b)(8) (considering history of substance abuse by those who have access to child's home). While F.A.M.'s two initial placements were not stable, his third and final one was, and that foster family intends to adopt him. TEX. FAM. CODE § 263.307(b)(1), (2) (court may consider child's age and vulnerabilities and frequency and nature of out-of-home placements).

After reviewing all the evidence, we conclude a reasonable factfinder could have formed a firm belief or conviction that termination of G.R.'s parental rights was in the best interest of F.A.M. *In re J.F.C.*, 96 S.W.3d at 266. We therefore hold factually sufficient evidence supports the trial court's best interest finding and overrule G.R.'s arguments to the contrary.

### *Conservatorship*

We review the trial court's appointment of a nonparent as sole managing conservator for an abuse of discretion and will reverse that appointment only if we determine it is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Having determined the evidence is factually sufficient to support the termination of G.R.'s parental rights, we further hold that the trial court did not abuse its discretion in appointing the Department F.A.M.'s managing

conservator. *See In re L.G.R.*, 498 S.W.3d 195, 207 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). We overrule G.R.'s final issue on appeal.

## CONCLUSION

We affirm the trial court's order of termination.

Beth Watkins, Justice